**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.

JOHNS MANVILLE CORPORATION;
JOHNS MANVILLE,

        Plaintiffs,

  v.

LIBERTY MUTUAL FIRE INSURANCE COMPANY; LIBERTY INSURANCE CORPORATION; IRONSHORE SPECIALTY INSURANCE COMPANY; NORTH AMERICAN ELITE INSURANCE COMPANY n/k/a SWISS RE CORPORATE SOLUTIONS ELITE INSURANCE CORPORATION; ALLIANZ GLOBAL RISKS US INSURANCE COMPANY,

        Defendants.

**COMPLAINT AND JURY DEMAND**

Plaintiffs Johns Manville Corporation and Johns Manville (collectively "JM"), for their Complaint and Jury Demand against Defendants Liberty Mutual Fire Insurance Company ("Liberty Mutual"); Liberty Insurance Corporation ("LIC"); Ironshore Specialty Insurance Company ("Ironshore"), and collectively with Liberty Mutal, and LIC, the "Liberty Insurers"); North American Elite Insurance Company n/k/a Swiss Re Corporate Solutions Elite Insurance Corporation ("Swiss Re"); and Allianz Global Risks US Insurance Company ("Allianz") (collectively, "the Insurers"), state and allege as follows:

1

## PARTIES

1. Johns Manville Corporation is incorporated under the laws of Delaware with its corporate headquarters in Denver, Colorado, and is a wholly owned subsidiary of Berkshire Hathaway. Johns Manville Corporation is a holding company for Johns Manville.

2. Johns Manville is incorporated under the laws of Delaware with its corporate headquarters in Denver, Colorado, and is a wholly owned subsidiary of Johns Manville Corporation, a wholly owned subsidiary of Berkshire Hathaway. Johns Manville is a leading manufacturer and marketer of insulation, commercial roofing, and other engineered products that are used in a wide variety of industries including building products, aerospace, automotive and transportation, filtration, commercial interiors, waterproofing, and wind energy.

3. Liberty Mutual is incorporated under the laws of Wisconsin, with its principal place of business in Wausau, Wisconsin and is licensed by the Colorado Division of Insurance to write property and casualty insurance in the State of Colorado.

4. On information and belief, Ironshore is incorporated under the laws of Arizona, with its principal office and place of business in Maricopa County, Arizona.

5. On information and belief, Liberty Insurance Corporation is incorporated under the laws of Illinois with its principal office and place of business in Boston, Massachusetts.

6. Swiss Re is incorporated under the laws of Missouri, with its principal office and place of business in Kansas City, Missouri.

7. On information and belief, Allianz is incorporated under the laws of California, with its principal office and place of business in Chicago, Illinois.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to the claims in this action occurred in this District.

## GENERAL ALLEGATIONS

10. This is an insurance case involving the Insurers' delay or refusal to pay certain benefits to JM owed under commercial liability insurance policies for losses incurred by JM.

11. The claims made by JM under the policies issued by the Insurers arise out of an underlying antitrust lawsuit brought against Johns Manville Corporation by its competitor, Chase Manufacturing, Inc. d/b/a Thermal Pipe Shields ("TPS").

12. The TPS lawsuit is styled, *Chase Mfg., Inc. d/b/a Thermal Pipe Shields v. Johns Manville Corp.,* No. 1:19-cv-872 (the "TPS claim").

13. TPS filed its lawsuit on March 22, 2019, naming Johns Manville Corporation and Industrial Insulation Group, LLC ("IIG") as defendants.

14. IIG was a Johns Manville subsidiary, but it merged with and into Johns Manville as of December 31, 2018.

15. On July 24, 2019, TPS amended its complaint and removed IIG as a defendant because TPS became aware that only Johns Manville survived the merger and IIG was no longer a viable entity.

16. The TPS Claim involved a product known as calcium silicate ("Calsil"). Johns Manville manufactured and sold a Calsil product; TPS imported and sold a Calsil product. TPS alleged in its Complaint and Amended Complaint, inter alia, that JM disparaged TPS's Calsil product.

**Insurance Program**

17. Prior to the merger, JM maintained separate liability insurance for IIG. The IIG liability insurance program specifically insured IIG's operations, services and Calsil products.

18. IIG purchased a primary insurance policy from LIC, policy number TB7-Z91-425294-047, covering the period December 31, 2017 to December 31, 2018, with limits of $1 million per occurrence and $2 million in the aggregate (the "LIC Primary Policy"). Ex. 1.

19. IIG purchased an umbrella insurance policy from LIC, policy number TH7-Z91-425294-067, covering the period December 31, 2017 to December 31, 2018, with limits of $10 million per occurrence and $10 million in the aggregate. Ex. 2.

20. JM was an additional insured under the IIG primary and umbrella liability policies listed above.

21. After the merger, JM needed to protect itself from liability for its subsidiary, so it purchased liability insurance coverage for itself that applied to IIG's operations, services and products. JM also had its own liability insurance coverage through ACE American between July 1, 2017 to July 1,2019 (policy numbers XSL G27870144 and XSL G71210522), but those policies specifically excluded IIG.

22. JM purchased an insurance policy from Liberty Mutual, policy number TB2-Z91-425294-049, covering the period January 1, 2019 to July 1, 2019, with limits of $1 million per occurrence and $2 million in the aggregate. Ex. 3.

23. JM maintained an excess insurance policy from Ironshore, policy number 000620908, covering the period July 1, 2018 to July 1, 2019, with limits of $10 million per occurrence and $10 million in the aggregate, where applicable.  The Ironshore policy was endorsed effective January 1, 2019 to sit excess over policy TB2-Z91-425294-049. Ex. 4.

24. JM purchased an insurance policy from Liberty Mutual, policy number TB2-Z91-425294-089, covering the period July 1, 2019 to July 1, 2020, with limits of $1 million per occurrence and $2 million in the aggregate. Ex. 5.

25. JM purchased an excess insurance policy from Ironshore, policy number 000620909, covering the period from July 1, 2019 to July 1, 2020, with limits of $10 million per occurrence and $10 million in the aggregate, where applicable.  This policy was endorsed effective July 1, 2019 to sit excess over policy TB2-Z91-425294-089. Ex. 6.

26. JM also maintained an umbrella liability insurance program that covered all of its entities, including IIG.

27. As pertinent here, JM purchased an umbrella liability insurance policy from Swiss Re, policy number UMB2000432 02, covering the period July 1, 2017 to July 1, 2018, with limits of $25 million per occurrence and $25 million in the aggregate. Ex. 7.

28. JM also purchased an umbrella liability insurance policy from Allianz, policy number USL00085418, covering the period July 1, 2018 to July 1, 2019, with limits of $25 million per occurrence and $25 million in the aggregate. Ex. 8.

29. Lastly, JM purchased an insurance policy from Allianz, policy number USL00085419, covering the period July 1, 2019 to July 1, 2020, with limits of $25 million per occurrence and $25 million in the aggregate. Ex. 9.

30. The Swiss Re and Allianz umbrella policies insured JM for any IIG related risk.

**The TPS Trial**

31. The TPS lawsuit was tried to a jury between April 22 and May 3, 2024.

32. Representatives of Liberty Mutual attended the trial.

33. Representatives of Ironshore attended the trial.

34. Representatives of Swiss Re attended the trial.

35. Representatives of Allianz attended the trial.

36. TPS presented evidence at trial that JM and IIG employees disparaged TPS's Calsil products.

37. The trial judge specifically instructed the jury that, in determining whether JM's threats were anticompetitive, and was thus liable on TPS's antitrust claim, they may consider whether the threats also involved false and disparaging statements about either TPS and/or its Calsil products.

38. As the primary insurer obligated to provide a defense to JM, Liberty Mutual routinely engaged in communications and discussions with JM's defense counsel, including communications and discussions on the TPS jury instructions.

39. Despite these communications, Liberty Mutual did not request a special verdict form at the TPS trial. In particular, Liberty Mutual did not request a special verdict form asking the jury to make specific findings on disparagement, including, but not limited to, the issues of

6

whether JM disparaged TPS's Calsil or whether the jury considered evidence of disparagement in rendering its verdict.

40. The jury ultimately found Johns Manville Corporation liable on TPS's antitrust claim, and rendered a verdict of $6,784.042.00 in TPS's favor. On November 29, 2024, the damages were remitted to $6,149,090.  Those damages were then trebled under the federal antitrust statute, and a judgment was entered against Johns Manville Corporation in the amount of $18,447,270.00 - along with an award for TPS's attorneys' fees and costs in the amount of $3,810,021.64 (the "TPS Judgment").

41. The jury received and considered evidence of disparagement presented at trial and, as such, the resulting judgment is covered under the above policies issued by the Insurers.

42. As set forth below, the above policies provide coverage for "personal and advertising injury" that includes publication of material that "disparages a person's or organization's goods, products, or services."

**Coverage for "Personal and Advertising Injury"**

43. Under each Liberty Mutual and Ironshore policy, Liberty Mutual and Ironshore agreed to "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies." JM Primary Policy, CGL Coverage Form, p. 6 (pdf p. 20); IIG Primary Policy, CGL Coverage Form, p. 6 (pdf p. 20); IIG Umbrella Policy, Comm. Liability Umbrella Form, p. 1 (pdf. p. 46).

44. Each Liberty Mutual and Ironshore policy defines "personal and advertising injury" to include "[o]ral or written 'publication' directly to the public at large of material that … disparages a person's or organization's goods, products or services." JM Primary Policy,

7

Endorsement – Personal and Advertising Injury Redefined, p. 1, (pdf. p. 59); IIG Primary Policy, (pdf p. 59); IIG Umbrella Policy, Comm. Liability Umbrella Form, p. 27 (pdf p. 72).

45. Under Swiss Re's policy it must pay "those sums in excess of the 'retained limit' that [JM] becomes legally obligated to pay by reason of liability imposed by law because of … 'personal and advertising injury.'" Swiss Re Policy, Comm. Umbrella Liability Policy, p. 1, (pdf p. 5).

46. Swiss Re's policy defines "personal and advertising injury" in relevant part as injury "arising out of … oral or written publication, in any manner, of material that … disparages a person's or organization's goods, products, or services." *Id.*, p. 19 (pdf p. 23).

47. Under Allianz's policy it must pay "those sums in excess of the "Retained Limit" that the "insured" becomes legally obligated to pay as damages by reason of liability imposed by law because of "personal injury". Allianz Commercial Umbrella Liability Policy, p.1, (pdf p.8).

48. Allianz's policy defines personal injury as "injury, other than "advertising injury" or "bodily injury", arising out of one or more of the following offenses…Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services…." *Id*., p.8, (pdf 14).

49. JM became legally obligated to pay damages to TPS in the amount of $22,257,294.60. The Insurers are liable to JM for the judgment rendered on the verdict.

**The Insurance Claim**

50. JM timely reported TPS's claim against it and requested coverage under the above policies issued by the Insurers.

8

51. Although Liberty Mutual agreed to provide a defense to JM under its policy numbered TB2-Z91-425294-049 in effect from January 1, 2019 through July 1, 2019, the Liberty Insurers have refused to acknowledge coverage under the LIC policies issued to IIG.

52. As listed above, LIC issued $11M in primary and excess liability insurance to IIG between December 31, 2017 and December 31, 2018, but the Liberty Insurers have refused to acknowledge coverage of the TPS claim under these policies despite JM being an additional insured under each such policy.

53. Specifically, the LIC Primary Policy contains, in relevant part, an "Additional Insured – Controlling Interest" endorsement under which the policy is "amended to include as an additional insured the person(s) or organization(s) shown in the [endorsement's] Schedule, but only with respect to their liability arising out of … [t]heir financial control of [IIG]…."

54. The referenced schedule in the Additional Insured – Controlling Interest endorsement specifically identifies Johns Manville and Johns Manville Corporation.

55. Some or all of the evidence of disparagement presented at the TPS trial and considered by the jury occurred during the policy period of the LIC Primary Policy, and prior to IIG's merger with Johns Manville. Accordingly, Johns Manville Corporation's liability for this conduct arises out of its then-financial control of IIG, triggering the Additional Insured – Controlling Interest endorsement.

56. Prior to trial, the allegations in TPS's Complaint and Amended Complaint alleged disparagement of TPS's Calsil by IIG employees during the policy period of the LIC Primary Policy, and prior to IIG's merger with Johns Manville. These allegations likewise triggered the Additional Insured – Controlling Interest endorsement.

57. But despite this trigger of coverage, the Liberty Insurers refused to acknowledge coverage under the LIC policies, or provide a defense or settlement contributions under these policies. The Liberty Insurers did so despite the fact that the status of Johns Manville and Johns Manville Corporation as additional insureds under the LIC policies is not fairly debatable.

58. Ironshore is a Liberty Insurer. Ironshore has refused to acknowledge coverage of the TPS claim under its excess policies.

59. The Swiss Re and Allianz policies are umbrella liability policies and do not follow the form of the Liberty Insurer's policies. The umbrella policies do not require exhaustion of the Liberty Insurer's policies so if the Liberty Insurers deny coverage of the TPS claim, then the umbrella policies must respond subject to their own policy language and self-insured retentions.

60. Swiss Re's policy has separate retained limits of (1) $6 million for "General Liability – Excluding Corbond and IIG", and (2) $11 million for "Umbrella Liability – IIG."

61. The TPS Judgment exceeds the retained limits in Swiss Re's policy.

62. Allianz's policies each have a $25,000 retained limit.

63. The TPS Judgment exceeds the Allianz's policies' retained limit.

64. Swiss Re and Allianz have refused to acknowledge coverage of the TPS claim under their policies.

65. In July 2024, after the verdict, JM wrote separately to the Liberty Insurers, Swiss Re and Allianz demanding that they pay up to their respective policy limits to satisfy the judgment.

66. The Liberty Insurers refused to pay up to their policy limits to satisfy the judgment.

67. Swiss Re refused to pay the judgment.

68. Allianz refused to pay the judgment.

**The Insurers Squander Settlement Opportunities**

69. Prior to the verdict, the Insurers failed to take advantage of opportunities to settle the case to protect their insured.

70. For example, JM prevailed on a motion for summary judgment on April 26, 2022. TPS appealed Judge Hegarty's ruling. This presented an opportunity to settle the case when the circumstances were favorable to JM.

71. The Liberty Insurers squandered the opportunity.

72. The 10th Circuit ultimately reversed Judge Hegarty's ruling in part and remanded the case back to the district court.

73. Prior to the May 2024 trial, JM demanded that the Insurers settle the case but they refused to protect JM's interests.

74. JM's defense counsel regularly provided the Insurers with timely updates on the case.

75. Pre-trial rulings made it clear that JM faced a significant risk of a substantial adverse verdict at trial.

76. Putting their interests ahead of their insured's, the Insurers subjected JM to a jury trial that did not need to occur.

**Liberty Mutual Fails to Timely Pay Experts**

77. Liberty Mutual authorized Compass Lexecon ("Compass") to serve as economic experts at trial.

78. The experts timely submitted their invoices on July 5, 2024.

79. On July 10, 2024, Liberty Mutual approved payment in the amount of $1,404,825.02 and advised that a check had been requested.

80. No check was received by Compass as of December 4, 2024, prompting a request for the status of payment to Liberty Mutual.

81. After receiving no response from Liberty Mutual, Compass contacted defense counsel directly.

82. On December 11, 2024, defense counsel asked Liberty Mutual to check on the payment or issue a replacement check.

83. Liberty Mutual responded on January 16, 2025 stating that the claim file was under reserved and there was insufficient money to pay the invoice. The claim representative advised that a reserve increase needed to be approved before payment could be processed.

84. The expert followed up with Liberty Mutual on February 12, 2025 asking if payment could be made by the end of the month. Liberty Mutual responded the same day stating that approval had not been obtained but that it would issue payment immediately after approval.

85. On March 11, 2025, Liberty Mutual had still not paid the amount it said had been approved on July 10, 2024.

86. On March 14, 2025, Liberty Mutual advised that approval had not been obtained but offered to immediately pay the expert half of the invoice. The expert agreed.

12

87. On information and belief, Liberty Mutual did not pay the 50% until early April.

88. On information and belief, as of May 5, 2025, Liberty Mutual had still not paid the amount in full.

89. On information and belief, as of July 17, 2025, Liberty Mutual has not paid Compass in full despite Liberty Mutual approving the payment more than a year before.

90. Liberty Mutual had no reasonable basis for delaying payment of $1.4M owed under the policy.

91. Liberty Mutual is required to keep adequate and timely reserves on its claim files.

**The Insurers Force Johns Manville to Pay the Judgment**

92. JM cooperated fully with the Insurers' investigation of the claim and otherwise complied with its duties under the above policies. Among other things, JM complied with the Insurers' requests for information, kept them apprised of the underlying TPS lawsuit, and provided ample information for the Insurers to evaluate coverage.

93. At trial, TPS presented evidence of disparagement of its Calsil product.

94. The jury was instructed that it could consider evidence of disparagement in rendering a verdict against Johns Manville Corporation.

95. A reasonable insurer would recognize that the adverse verdict triggered its obligations to pay some or all of the judgment.

96. JM, left to fend for itself by the Insurers, ultimately resolved the TPS matter post-verdict and funded the settlement on its own.

97. Despite the clear terms of the policies issued by the Insurers and evidence of a covered claim having been provided by JM, the Insurers refused to pay the amounts owed under the above policies for this covered loss.

98. The Insurers' failure to pay covered benefits owed under the above policies constitutes a breach of contract and has caused JM to incur damages.

99. In addition, the Insurers have unreasonably delayed and denied payment of covered insurance benefits without a reasonable basis, constituting bad faith under Colorado law.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

100. JM incorporates by reference the allegations contained in paragraphs 1 through 99 as if fully set forth herein.

101. JM entered into binding written agreements with the Insurers to provide insurance coverage as described above.

102. JM fully performed its obligations under the policies by paying the applicable premiums in full and on a timely basis. JM has satisfied any conditions to coverage under the policies, including payment of premiums due and submission of timely notices.

103. The Insurers have materially breached the policies by refusing to pay the full benefits owed under the policies and to otherwise perform their obligations under the policies.

104. The refusal by the Insurers to perform and pay benefits under the policies is not excused or justified in any manner.

105. As a result of the Insurers' breach of the policies, JM has been damaged and is entitled to recover damages.

## SECOND CLAIM FOR RELIEF
### (Bad Faith Breach of Insurance Contract)

106.   JM incorporates by reference the allegations contained in paragraphs 1 through 105 as if fully set forth herein.

107.   Pursuant to C.R.S. § 10-3-1103, no entity engaged in the insurance business in the State of Colorado may engage in any unfair or deceptive act or practice when conducting the business of insurance.

108.   The Insurers may not engage in any unfair or deceptive act or practice when conducting the business of insurance in the State of Colorado.

109.   Every contract or policy of insurance contains implied covenants of good faith and fair dealing owed by the insurer to the insured.

110.   The policies sold by the Insurers to JM contain implied covenants of good faith and fair dealing owed by the Insurers to JM.

111.   The Insurers owe to JM a duty of good faith and fair dealing in connection with JM's request that the Insurers pay benefits to JM as required under the policies.

112.   Pursuant to C.R.S. § 10-3-1104(1)(h), the following acts or practices, as engaged in by the Insurers in connection with the claims submitted by JM, are unfair claim settlement practices:

   a) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

   b) Refusing to pay claims without conducting a reasonable investigation based upon all available information;

  c) Not attempting, in good faith, to effectuate prompt, fair and equitable settlement of claims in which liability has become reasonably clear;

  d) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies; and

  e) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies.

113. The Insurers committed unfair and deceptive trade practices and acted in bad faith as shown in the foregoing allegations. The Insurers either knew that its actswere unreasonable and in bad faith or recklessly disregarded the fact that its acts were unreasonable and in bad faith.

114. The Insurers' unreasonable acts and bad faith misconduct have caused damage to JM and will continue to cause damages into the future.

## THIRD CLAIM FOR RELIEF
### (Statutory Violations)

115. JM incorporates by reference the allegations contained in paragraphs 1 through 114 as if fully set forth herein.

116. Pursuant to C.R.S. § 10-3-1115, a person engaged in the business of insurance shall not unreasonably delay or deny payment of a claim for benefits owed to or on behalf of any first-party claimant.

117. The Insurers are persons engaged in the business of insurance in the State of Colorado.

118. JM is a first-party to the insurance contract with the Insurers and is seeking benefits provided by the Insurers through the policies.

119. The Insurers may not unreasonably delay or deny payment of a claim for benefits under the policies.

120. JM made timely notices of its claim to the Insurers.

121. The Insurers' basis for refusing to pay the full amount of the TPS claim is not supported by the evidence and the Insurers have refused to acknowledge JM's evidence in support of the covered loss incurred as a result of the TPS claim.

122. The Insurers have unreasonably delayed payments of benefits owed to JM under the policies.

123. The Insurers' delay of payment of benefits owed to JM constitutes a violation of C.R.S. § 10-3-1115.

124. As a result of the Insurers' unreasonable delay and denial of payment of covered benefits, JM has sustained damages, including without limitation the attorneys' fees incurred by JM in bringing this action. Pursuant to C.R.S. § 10-3-1116, JM seeks recovery of attorneys' fees, the covered benefit and up to two times the covered benefit owed under the policies.

### FOURTH CLAIM FOR RELIEF
### (Declaratory Judgment)

125. JM incorporates by reference the allegations contained in paragraphs 1 through 124 as if fully set forth herein.

126. The rights and duties of JM and the Insurers under the policies are governed by the laws of the State of Colorado.

127. An actual and justiciable controversy exists between JM, on one hand, and the Insurers, on the other, concerning the Insurers' duties and obligations under the policies, including but not limited to their obligation to provide coverage for JM's loss.

128. Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and Fed. R. Civ. P. 57, JM requests that the Court enter a judgment declaring the rights, status, and other legal relations between the parties under the policies.

129. Specifically, JM requests that the Court declare as follows:

a. The TPS judgment was supported by evidence of disparagement of TPS's Calsil product at trial;

b. The damages awarded by the jury are covered under the policies;

c. The Insurers are obligated to provide coverage for JM's loss under the terms of the policies;

d. The Insurers have a duty to indemnify JM under the policies; and

e. The Insurers' failure to provide coverage and pay benefits for the loss is a breach of their obligations under the policies.

130. Declaratory relief is appropriate and necessary to resolve this dispute and to afford JM the relief and certainty to which it is entitled under federal law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against The Insurers for:

1. Actual, compensatory, and consequential damages in an amount to be proved at trial;

2. All damages available per statute, in an amount to be determined at trial;

3. Non-economic damages in an amount to be determined at trial;

4. A declaration from the Court that the TPS judgment involving trial evidence of disparagement would trigger coverage under the policies;

5. Pre-judgment and post-judgment interest as allowed by law;

6. Costs for pursuing this lawsuit, including attorneys' fees, as allowed by law; and

7. For any and all other relief the Court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all claims asserted in this action.

Dated: September 10, 2025

Respectfully submitted,

*s/ Jose A. Ramirez*

Jose A. Ramirez
Katherine D. Varholak
Shannon N. Calhoun
Michael E. Harmond*
HOLLAND & HART LLP
555 17th Street, Suite 3200
Denver, CO 80202-3921
Telephone: 303.295.8000
JRamirez@hollandhart.com
KDVarholak@hollandhart.com
SNCalhoun@hollandhart.com
MEHarmond@hollandhart.com

*admission application pending*

***Attorneys for Plaintiffs Johns Manville Corporation and Johns Manville***

**CERTIFICATE OF SERVICE**

 I hereby certify that on September 10, 2025 I have caused to be electronically filed the foregoing with the Clerk of Court using CM/ECF system.

                *s/ Jose A. Ramirez*
                Holland & Hart LLP