IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-CV-02846-RMR-NRN

JOHNS MANVILLE CORPORATION, and
JOHNS MANVILLE,

       Plaintiffs,

v.

LIBERTY MUTUAL FIRE INSURANCE COMPANY,
LIBERTY MUTUAL INSURANCE CORPORATION,
IRONSHORE SPECIALTY INSURANCE
COMPANY, NORTH AMERICAN ELITE
INSURANCE COMPANY n/k/a SWISS RE
CORPORATE SOLUTIONS ELITE INSURANCE
CORPORATION; ALLIANZ GLOBAL RISKS US
INSURANCE COMPANY,

       Defendants.

_____

LIBERTY MUTUAL FIRE INSURANCE COMPANY,
LIBERTY INSURANCE CORPORATION,
IRONSHORE SPECIALTY INSURANCE
COMPANY,

Counterclaim Plaintiffs,

v.

JOHNS MANVILLE CORPORATION, and
JOHNS MANVILLE,

Counterclaim Defendants.

---

## ALLIANZ'S ALTERNATIVE MOTION FOR SUMMARY JUDGMENT ON DUTY TO INDEMNIFY

Defendant Allianz moves under Fed. R. Civ. P. 56 for a summary judgment determination that it has no duty to indemnify Plaintiffs to any degree.  Alternatively, Allianz asks the Court to grant summary judgment against JMC on two-thirds of any indemnity obligation owed by Allianz.

## I.  ADOPTION OF CO-DEFENDANTS' SUMMARY JUDGMENT MOTIONS ON DUTY TO INDEMNIFY.

Allianz adopts and joins in the "no duty to indemnify" summary judgment motions filed on this date by Allianz's co-defendants (except that Part III.E. of the Liberty Insurers' motion does not apply to Allianz).  The rest of this motion is Allianz's alternative summary judgment motion on duty to indemnify.

## II.  SUMMARY OF ALLIANZ'S ALTERNATIVE MOTION.

JMC wants Allianz to indemnify JMC for money JMC paid to TPS to settle the underlying Antitrust Judgment.  Colorado law requires examination of the underlying Trial record to determine if Allianz has a duty to indemnify.  Application of the plain terms of the Allianz Polices to uncontroverted Trial evidence shows there is no coverage.  Hence Allianz has no duty to indemnify.

JMC invokes Allianz Policy trigger coverage for "personal injury" to TPS arising from JMC's "publication" of "material" that "disparaged" TPS's calsil (an industrial insulation product sold by TPS).  In this context, "material" means a statement, "published" means the statement was conveyed to a third party (i.e. the recipient was not JMC or TPS), and "disparaging" means the statement was derogatory in nature.

The 9-day Trial record contains evidence of just four alleged statements, by JMC to another, that arguably disparaged TPS calsil.  The Trial evidence is controverted

1

whether two of those statements were actually made; whether a third statement (although established as made) was disparaging in nature; and whether the fourth statement (although established as made and as disparaging in nature) addressed calsil sold by TPS rather than sold by an unidentified entity.

For two separate reasons, the Allianz Policies provide no coverage at all based on any of the four alleged statements.

First, JMC cannot meet its burden of showing trigger coverage for disparagement based on any of the four alleged statements.

The Policy provides trigger coverage only where the injury was committed during the Policy period.  Uncontroverted Trial evidence establishes that three of the four alleged statements were not committed during a Policy period.  Thus no coverage can arise from any of those three statements, even assuming (*arguendo*) they were actually made, were disparaging in nature, and disparaged TPS's calsil.

Regarding the fourth statement, under the Trial evidence it could have been made in October of 2018, 2019, or 2020.  If made in October 2020, it too was not committed during a Policy Period.  Therefore JMC cannot prove trigger coverage based on that statement.  (Also, the Trial evidence is controverted whether the fourth statement was actually made, in any year.)

Second, even assuming arguendo that the fourth statement was actually made, and that it was made in October of 2018 or 2019, the uncontroverted Trial evidence satisfies Allianz's burden of proving that the Policies' Prior Publication exclusion applies to that statement.  This exclusion bars coverage where a statement is published during

2

a policy period but the "first publication" of that statement "took place before the beginning of the policy period."  The exclusion (which is separate from the above-discussed trigger coverage requirement of publication during the Policy period) addresses situations where a publication made during the Policy period also was previously published before the Policy incepted.  In that situation, the exclusion bars coverage for the publication made during the Policy period so long as the two publications are "substantially the same."

The uncontroverted Trial evidence shows that all three of the alleged statements made before an Allianz Policy period began were substantially the same as the fourth alleged statement.  All four alleged statements were the same in substance because they all disparaged TPS calsil and they all did so on the same basis—namely, that the TPS calsil was imported from China, and Chinese calsil might not meet U.S. standards.  Thus the exclusion bars coverage for the fourth alleged statement even assuming (arguendo) that the fourth statement was actually made and that it was made in October of 2018 or 2019 rather than October 2020.  Hence Allianz has no duty to indemnify at all.

Alternatively to the two foregoing arguments, Allianz makes a third argument about partial indemnity.  To the extent Allianz may have a duty to indemnity, the punitive damages endorsement in the Allianz Policies bars coverage for two-thirds of the amount JMC seeks.  Two-thirds of the Antitrust Judgment was created by trebling the Trial verdict.  The trebling was performed under 15 U.S.C. § 15.  Under that statute, deterrence is a key purpose (one of three recognized purposes) for trebling a verdict.

3

The Allianz Policies define "punitive damages" as an amount added, <u>for deterrent</u> <u>effect</u>, to an actual loss.  Only the Trial verdict was TPS's actual loss.  The rest of the Antitrust Judgment—two-thirds of it—falls under the Policies' definition of "punitive damages" as an amount added for deterrent effect.  The Policies do not cover damages falling within that definition.  Therefore the Policies do not cover two-thirds of the Antitrust Judgment; and, proportionally, the Policies do not cover two-thirds of the settlement of that judgment.

**III.    STATEMENT OF ADDITIONAL UNDISPUTED FACTS SPECIFIC TO ALLIANZ**

  **A.    The Allianz Policies.**

1.    Plaintiffs' Instant Complaint (¶¶ 28-29) seeks coverage under the two Allianz policies ("Policies") described in Defendants' Common Statement of Facts (ECF 63 in this action) and included in the Appendix thereto (ECF 63-1).  Allianz incorporates ECF 63 and ECF 63-1 here.  Also, Allianz uses the Common Statement's abbreviations.

2.    A Denver insurance broker (Lockton) issued the Policies to JMC at JMC's Denver address.  ECF 63-1, pp. 927, 992[1] (Allianz_001544, Allianz_001675).

3.    The Policies' potential coverages include "personal injury."  ECF 63-1, p. 932 ¶ A (Allianz_001549).  (The Policies have the same relevant substantive provisions; thus henceforth only the first is cited absent a reason to cite both.)

---

[1] Citations to page numbers in ECF documents are to the pages numbers assigned by the ECF system. Those numbers appear in the blue banner at the top of each page.

4.      As pertinent here, "personal injury" means "injury … arising out of … [o]ral or written publication, in any manner, of material that … disparages a person's or organization's goods, products or services." ECF 63-1, p. 939 ¶ P.4 (Allianz_001556).

5.      There is coverage for personal injury "only if … [t]he personal injury … is committed during the policy period." ECF 63-1, p. 932 ¶ C.2 (Allianz_001549) (underlying added).

6.      The Policies also state that "[t]his insurance does not apply to … Personal Injury … [a]rising out of the oral or written publication of material whose first publication took place before the beginning of the policy period."  ECF 63-1, p. 943 ¶ M.6 (Allianz_001560) (underlying added).  Henceforth, this is the "Prior Publication Exclusion."

7.      The Policy periods were:  July 1, 2018 to July 1, 2019; and July 1, 2019 to July 1, 2020.  ECF 63-1, pp. 927, 992.

**B.      Background Facts.**

8.      Calcium silicate, or "calsil," is a manufactured product used to insulate high-temperature pipes and other equipment in industrial facilities.  ECF 63-1, p. 304 (Trial Jury Instr. #27).

9.      "For several years prior to 2018, JM was the sole domestic manufacturer of calsil, but in March 2018 TPS also began selling calsil in the U.S."  ECF 63-1, p. 303 (Trial Jury Instr. #26).

10.      JMC manufactured its calsil in factories in the U.S.  Allianz Appendix ("Allz App'x," filed with this motion), p. 63 (4/29/24 Trial TR, p. 1044:22-25).

11.     The TPS calsil was manufactured in China by a Chinese company (called
BEC).  Allz App'x, p. 6 (4/22/24 TR, p. 182:1-14).  TPS imported that calsil into the U.S.
Allz App'x, p. 7 (4/22/24 TR, p. 194:7-12).

12.     On March 8, 2018, TPS announced it was now selling calsil in the United
States.  Allz App'x, pp. 73-80 (Trial Ex. D19, 4/8/18 Product Launch Announcement).
(For exhibits to this motion that were also exhibits admitted at the underlying Trial,
Allianz uses the same exhibit numbers used in the Trial.)

**C.     Description of Trial evidence of the alleged statements to others that
arguably disparaged TPS calsil.**

**1.  Conversation between Hal Shapiro and Robert Hlavenka.**

13.     In early March 2018, Hal Shapiro was JMC's sales leader for industrial
insulation products.  Allz App'x, p. 65 (4/29/24 TR, p. 1145:6-7).

14.     In the U.S., the primary purchasers of industrial insulation products are
entities that distribute those products.  Allz App'x, pp. 8-9 (4/22/22 TR, pp. 210:21-
211:22).

15.     Distribution International ("DI") was a large U.S. distributor of those
products.  Allz App'x, p. 12 (4/23/24 TR, p. 265:10-12).  Robert Hlavenka was a senior
vice president at DI.  Allz App'x, p. 19 (Hlavenka 9/22/21 Depo. TR, played at Trial on
4/24/24, pp. 9:17-10:2).

16.     During his testimony, Hlavenka was asked if he "ever hear[d] any criticism
of TPS's CalSil by any Johns Manville personnel?"  He answered that Shapiro made a
statement to him to the effect that "you have to be real careful with Chinese CalSil
because the amount of free silica in their product could be a huge issue."  Allz App'x,

pp. 21-22 (Hlavenka Depo. TR, pp. 41:9-42:19).  (Inhaling silica particles has been linked to disease. www.osha.gov/silica-crystalline.)

17. At Trial, Shapiro testified that he knew Hlavenka from when he (Shapiro) had worked at JMC.  But when Shapiro was asked if he told Hlavenka to be careful of silica in Chinese calsil, Shapiro answered:  "Not that I can recall."  Allz App'x, p. 66 (4/29/24 TR, p. 1169:13-23).

### 2. Evan Stone's March 23, 2018 email.

18. In March 2018, Evan Stone was a JMC industrial insulation regional sales manager.  Allz App'x, p. 47 (Stone 8/27/21 Depo. TR, played at Trial on 4/25/24, pp. 12:4-17).

19. On March 23, 2018, a representative of DI sent an email to Stone.  As TPS was now selling calsil in the U.S., DI asked JMC to lower the price JMC was charging DI for JMC's own calsil.  Allz App'x, p. 83 (Ex. P6, 3/23/18 emails, p. 3).

20. Stone replied to DI on the same day.  The reply included a statement that TPS calsil posed "potential dangers and liabilities" due to "the inherent product inequities in this imported product."  Allz App'x, pp. 82-83 (Ex. P6, pp. 2-3).  Stone's email did not explain what Stone meant by that statement.

21. At Trial, Stone testified that "potential dangers and liabilities" in his email meant that some contracts contained "restricted supply" clauses that stipulated the origin of products used.  Allz App'x, p. 48 (Stone Depo. TR, pp. 48:21-49:10).

### 3.  JMC's Spring 2018 Workshop Power Point Slide.

22.    In "Spring 2018," JMC conducted an Industrial Product Information Workshop ("Workshop") in Brunswick, Georgia.  The Workshop was only open to industrial insulation distributors, contractors who installed that insulation, and owners of industrial facilities where that insulation was installed.  Allz App'x, pp. 58-59 (Jack Bittner 8/26/21 Depo. TR, played at Trial on 4/29/24, pp. 105:2-106:6).  *And see* Allz App'x, pp. 71-72 (Ex. P127, JM Workshop Power Point Slide).

23.    A JMC Workshop Power Point slide stated as follows about unidentified imported calsil:  "Some **imports** use old process/formulas which do not contain a corrosion inhibiting package"; and "Several **imports** failed several key ASTM [Amer. Society for Testing Materials] tests regarding corrosion, combustibility and chloride content."  Allz App'x, p. 72 (Ex. P127) (original bolding) (hereafter, "Slide").

24.    The same Slide contained a photograph of two pieces of calsil that had been cut in half to expose their interiors.  The piece on the photo's left side was JMC calsil.[2]  The piece on the right was unidentified "Import" calsil.  The photo depicts the interior of the JMC calsil as solid.  The photo depicts the interior of the Import calsil as largely hollow.  Allz App'x, p. 72 (Ex. P127).

25.    The Slide did not mention TPS.  The Slide did not identify the seller or manufacturer of any import calsil described in the Slide's text or shown in its photo.

---

[2] The label "T12" under that calsil was the name for an older version of JMC calsil.  Allz App'x, pp. 61-62 (4/29/24 TR, pp. 1019:18-1020:5).

26.     At Trial there was undisputed testimony that the TPS calsil was made through a "filter press" process that exerted tons of hydraulic pressure on the calsil.  The JMC calsil was not made through that process.  Due to this difference, TPS calsil was denser, and had more compressive strength, than JMC calsil.  Allz App'x, pp. 2-5 (4/22/24 TR, pp. 177:20-180:11). *Accord* Allz App'x, p. 20 (Hlavenka Depo. TR, pp. 24:16-25:13), pp. 50-51 (4/25/24 TR, pp. 831:20-832:19); p. 69 (4/30/24 TR, p. 1500:1-16).

### 4.  Conversation between Chad Meyer and Joe Guest.

27.     During the relevant time period, Chad Meyer was a JMC regional sales manager for industrial insulation.  Allz App'x, p. 41 (Meyer 7/27/21 Depo. TR, played at Trial on 4/25/24, pp. 16:18-17:13), p. 52 (4/25/24 TR, p. 884:20-25), p. 64 (4/29/24 TR, p. 1122:7-10).

28.     During the relevant time period, Joe Guest was a sales manager for a distributor called 4-State Supply.  Allz App'x, p. 26 (Guest 9/14/21 Depo. TR played on 4/25/24, p. 14:9-13).  Meyer was Guest's primary JMC contact.  Allz App'x, p. 27 (Guest Depo. TR, p. 28:1-3).

29.     Guest testified that, in October of a year he could not pinpoint, he had a one-on-one conversation with Meyer at the annual October conference of the Midwest Insulation Contractors Association ("MICA"). Guest testified that Meyer said the following during that conversation:  public shipping records showed that 4-State was buying TPS calsil; and, if 4-State kept buying TPS calsil, then JMC would stop selling its

own calsil to 4-State.  Allz App'x, pp. 28-29, 30, 32-33 (Guest Depo. TR, pp. 31:12-33:18, p. 38:1-14, pp. 198:10-199:15, pp. 200:17-201:18).

30.    Regarding the same October MICA conference conversation, Guest also testified as follows, at Allz App'x, p. 31 (Guest Depo. TR, p. 44:11-19):

> "Q.  Did Mr. Meyer make any comments about TPS's product?
> A.  No.
> Q.  Okay.  So he didn't suggest the quality of TPS's Calsil was inferior?
> A.  No.
> Q.  Okay. Did he suggest that TPS Calsil may contain asbestos?
> A.  He did not, no."

31.    At Trial, Meyer testified about the same conversation with Guest at a fall trade show, again in an unidentified year.  Allz App'x, pp. 42-43 (Meyer Depo. TR, pp. 133:10-135:11).  Meyer testified that he did not suggest to Guest that TPS calsil might not meet U.S. standards.  Allz App'x, p. 42 (Meyer Depo. TR, pp. 133:23-134:3).

32.    But when Meyer was additionally asked if he "suggest[ed]" to Guest "that any CalSil imported from China might include asbestos?", Meyer answered: "I relayed [to Guest] a story that had been circulated around the industry that in the past there was a sample of CalSil that came in from China that may have contained trace amounts of asbestos."  Allz App'x, p. 43 (Meyer Depo. TR, pp. 134:21-135:11) ("Industry Story").

## IV.    DECISIONAL PRINCIPLES

Rule 56 standards.  Allianz adopts this Court's recitation of the familiar standards for resolving Rule 56 summary judgment motions.  *E.g.*, *Smither v. Am. Family*, 21-cv-00947-RMR-STV, 2023 WL 1801404, at *3 (D. Colo. Feb. 7, 2023).

10

Colorado law governs.  The Allianz Policies have no choice-of-law provision. Colorado law governs their interpretation, because a Denver insurance broker issued them to JMC at JMC's Denver address.  *P&S LLC v. Nat'l Union Fire Ins. Co.*, 650 F. App'x 561, 566 (10th Cir. 2016) (Colorado law governs an insurance contract entered into in Colorado where Colorado is also the insured's place of business).

Policy interpretation.  Colorado insurance policies are interpreted "according to principles of contract interpretation." *Id.*  Unambiguous policy language is "enforce[d] … as written" and "must be given effect according to the plain and ordinary meaning of its terms." *Id.*  Policy language is ambiguous only if it is "reasonably susceptible on its face to more than one interpretation." *Id.* (cleaned up).  Language is not ambiguous just because the parties disagree on its meaning. *Id.*

## V.    ARGUMENT

### A.    Colorado principles for determining duty to indemnify.

An insurer's duty to indemnify refers to an "insurer's duty to satisfy a judgment entered against an insured."  *Cyprus Amax Minerals Co. v. Lexington Ins. Co.,* 74 P.3d 294, 299 (Colo. 2003).  The duty "arises only when the policy actually covers the harm and typically cannot be determined until resolution of the underlying claims."  *Id.*, at 301.

As pertinent to this particular motion, "when the claims 'proceed through the crucible of trial,' 'the court must look to the facts as they developed at trial and the ultimate judgment' to determine whether an insurer has a duty to indemnify the insured." ECF 57 (this Court's Feb. 27, 2026 Order in this case), p. 5, quoting *Cyprus*, at 301.

11

When the facts developed at the underlying trial establish that the policy does not actually cover the underlying judgment—whether because the facts show that the policy's requirements for trigger coverage are not met or they show that a policy exclusion applies—then the lack of duty to indemnify is determined on a motion for summary judgment. "*See, e.g.*, *N.H. Ins. Co. v. TSG Ski & Golf, LLC*, 128 F.4th 1337 [, 1350-52] (10th Cir. 2025) (affirming summary judgment for insurer where underlying trial record showed that policy's knowledge-of-falsity exclusion barred coverage for insured's underlying defamation); *Admiral Ins. Co. v. Hosler*, 626 F. Supp. 2d 1105 [, 1112-19] (D. Colo. 2009) (granting summary judgment for insurer where underlying trial record showed there was no covered 'bodily injury')." ECF 57, Order p. 5.

### B.    JMC cannot show trigger coverage.

As a threshold matter, JMC has the burden of demonstrating that coverage is triggered. *Rocky Mountain Prestress v. Liberty Mut. Fire Ins.*, 960 F.3d 1255, 1260 (10th Cir. 2020) (Colo. law). Here, JMC must demonstrate that the Trial evidence establishes that JMC "published" "material" that "disparaged" TPS calsil.

In the current context, "material" means a statement; "disparaging" means derogatory in nature; and "published" means that the statement was conveyed to a third-party. *Teilhaber Mfg. v. Unarco Materials*, 791 P.2d 1164, 1166 (Colo. App. 1989). A "third party" must be someone other than JMC or TPS. *See id.*; *Card v. Blakeslee*, 937 P.2d 846, 850 (Colo. App. 1996); *C.J.I 4th–Civ.* 22:7 (April 2025 update). Internal JMC communications cannot qualify for trigger coverage because they did not include a

third party.  JMC must show that the Trial evidence established that JMC made, to

others, statements that were disparaging of TPS calsil.

Close review of the 9-day Trial record yields evidence of just four alleged JMC

statements that even <u>arguably</u> disparaged TPS calsil to others.  Those statements are

described in headings III.C.1 through III.C.4., above.  They are:

(1)  Hlavenka testified that Shapiro told him that Chinese calsil may contain
     excessive silica, but Shapiro did not recall saying that to Hlavenka;

(2)  Stone's email contained a sentence that a seller of Chinese-made calsil
     could face "potential dangers and liabilities," and Stone testified he was
     referring to contractual restrictions on product origin;

(3)  The Workshop Slide indicated that unidentified "import" calsil did not meet
     ASTM standards and was largely hollow, but the Slide did not identify the
     calsil as being TPS calsil, and uncontroverted Trial evidence contravened
     the possibility that TPS calsil could be hollow; and

(4)  Meyer testified that he told the Industry Story to Guest, but Guest did not
     testify that Meyer told it.

Henceforth, "Statements" means the evidence of those four statements as just

described.

### 1.    JMC cannot prove coverage for Statements (1), (2), and (3), because they were not committed during a Policy period.

As noted, there is no coverage for personal injury unless it was committed

"during the policy period."  The Allianz Policy periods were July 1, 2018 to July 1, 2019

and July 1, 2019 to July 1, 2020.  The second Policy was consecutive to the first, with

no time gap between them.  The Policies overlapped on July 1, 2019.  Thus there is a

combined continuous Policy period of July 1, 2018 to July 1, 2020.

13

Because the injury must have been committed during the policy period, there can be no trigger coverage unless JMC published a disparaging statement about TPS calsil between July 1, 2018 and July 1, 2020.  But the uncontroverted Trial evidence establishes that Statements (1), (2), and (3) were all published before that time period began.[3]  Specifically:

- If Shapiro did tell Hlavenka that Chinese calsil contains excessive silica, then he necessarily said so no later than March 21, 2018, because March 21, 2018 was his last day at JMC.

- Stone's email was sent on March 23, 2018.

- The Workshop occurred in "Spring 2018." The exact date is unknown, but this Court may—and Allianz formally requests that it does—take judicial notice that Spring 2018 in the U.S. ended when the summer solstice occurred at 6:07 a.m. Eastern time on June 21, 2018.  www.nesdis.noaa.gov/news/the-summer-solstice-seen-space.[4]  Therefore the Slide was published no later than June 20, 2018.

The dates of March 21, 2018 (and any date before it), March 23, 2018, and June 20, 2018 (and any Spring 2018 date before it) do not fall between July 1, 2018 and July 1, 2020.  Thus JMC cannot prove trigger coverage based on Statements (1), (2), or (3).

---

[3] This assumes, *arguendo*, that Statement (1) was actually made, that Statement (2) was actually disparaging, and that Statement (3) addressed TPS calsil.

[4] *See* Fed. R. Evid. 201(b), (c)(2); *Lounchi v. Garland*, No. 21-9534, 2021 WL 6124886, at *4 (10th Cir. Dec. 28, 2021) (courts take judicial notice of "[s]cientific facts such as when the sun rose or set on a particular day," and those facts may be referenced on the internet).

### 2. JMC cannot prove coverage for Statement (4), because under the Trial evidence that alleged statement could have occurred outside the Policy periods.

Meyer and Guest agreed they conversed during a fall trade show, but neither one identified the year. Because TPS started selling calsil in March 2018, and because Meyer and Guest testified at trial through their depositions taken before October 2021 (July 27, 2021 and September 14, 2021 respectively; *see* Allz App'x, pp. 40, 25), the conversation had to have occurred in October of either 2018, 2019 or 2020. If it occurred in October 2018 or 2019, then it fell within July 1, 2018 and July 1, 2020. But if it occurred in October 2020, then it fell outside that time period, and there would be no coverage for it. (Moreover, regardless of the year, although Meyer testified he told Guest the Industry Story, Guest did not testify that Meyer told it.)

In *TSG*, the Tenth Circuit concluded that the underlying trial evidence established that certain statements were made, and that a certain policy provision was thereby satisfied, where the relevant underlying trial evidence was "uncontroverted." 128 F.4th at 1350. But here the Trial evidence does not incontrovertibly establish that Statement (4) (if made at all) was made during a Policy period. Hence JMC cannot satisfy its burden of proving trigger coverage based on Statement (4).[5]

---

[5] Nor may JMC augment Guest's Trial testimony. JMC is limited to the evidence about Statement (4) presented at Trial. *See Am. Fire & Cas. Co. v. BCORP Canterbury at Riverwalk*, 282 F. App'x 643, 649 (10th Cir. 2008) (rejecting affidavits that "more fully describe[d]" underlying trial testimony; "an indemnity dispute is not an opportunity" to retry underlying case); *Clarendon Nat'l Ins. v. Brooktree Village HOA*, 19-cv-02324-KMT, 2020 WL 5134537, at *2-3 (D. Colo. Aug. 31, 2020) (citing *BCORP* when quashing insured's discovery toward insurer, where underlying action had been tried);

### C.    The Prior Publication Exclusion separately bars coverage for Statement (4).

Separate from the argument in subheading V.B.2 just above, coverage for Statement (4) is separately barred by the Prior Publication Exclusion ("PPE").  Allianz has the burden of showing the exclusion applies.  *Rocky Mtn Prestress*, 960 F.3d at 1260.  For the reasons that follow, that burden is met.

The PPE excludes coverage for injury arising from publication of material "whose first publication took place before the beginning of the policy period."  Under that exclusion, there is no coverage where the statement published during the policy period also was previously published before the policy period began.  *Ringler Associates Inc. v. Maryland Cas. Co.*, 96 Cal. Rptr. 2d 136, 150 (Cal. App. 2000) (granting summary judgment for insurer under PPE).[6]  The purpose of this exclusion is  "to prevent an individual who has caused an injury from buying insurance so that he can continue his injurious behavior."  *Scout LLC v. Truck Ins. Exch.,* 434 P.3d 197, 205 (Idaho 2019) (granting summary judgment for insurer under PPE).

Importantly, the PPE does not require that the later publication "literally restated" the prior publication "in precisely the same words."  *Ringler,* 96 Cal. Rptr. 2d at 150.

---

*Lua v. QBE Ins. Corp.*, 421 F. Supp. 3d 1082, 1095 (D. Colo. 2019) (citing *BCORP* to reject affidavits describing scope of issues tried in underlying arbitration).

[6] Allianz cites cases outside Colorado because the only Colorado PPE case Allianz has located—*Travelers Indemn. Co. v. Luna Gourmet Coffee & Tea Co.*, 533 F. Supp. 3d 1013 (D. Colo. 2021)—does not apply here.  In *Luna*, Judge Moore held that the "four corners" rule barred using information outside the underlying complaint to decide if the PPE eliminated a duty to defend.  *Id.*, at 1020-21.  Judge Moore did not interpret or apply the PPE itself.  Also, his rationale is not germane to the duty to indemnify, for which *Cyprus* directs this Court to examine the underlying trial record.

Rather, the PPE bars coverage so long as the two publications are "substantially the same." *Id.* They are "substantially the same" if they do not "differ in substance." *Id.*, at 151.

Allianz now applies the record facts to the PPE.

The first consideration is the inception dates of the Allianz Policies. As discussed, the Policies were in force from July 1, 2018 to July 1, 2020. Thus there is one effective inception date of July 1, 2018.

The second consideration is whether JMC published a disparaging statement about TPS calsil before July 1, 2018. As shown in subheading V.B.1 above (incorporated here), Statements (1), (2), and (3) incontrovertibly were all published before that date.[7]

The third consideration is whether JMC published a disparaging statement about TPS calsil on or after July 1, 2018 (and, per subheading V.B., within a Policy period). As discussed, if Meyer did tell the Industry Story to Guest, then he did so in either October 2018, 2019, or 2020. As noted, if he told it in October 2020 then it was outside a Policy period. But if he told it in October 2018 or 2019 then it was within a Policy period.

Assuming arguendo that Meyer did tell the Industry Story to Guest, and that he did so in October of 2018 or 2019, the final consideration is whether at least one of Statements (1), (2), or (3) was substantially the same as Statement (4). Statements (1),

---

[7] Again, this assumes, *arguendo*, that Statement (1) was actually made, that Statement (2) was actually disparaging, and that Statement (3) addressed TPS calsil.

17

(2), and (3) were all substantially the same as Statement (4).  All four Statements disparaged TPS calsil, and they all did so on the same basis:  namely, that TPS calsil was imported into the U.S. from China, and Chinese calsil might not meet U.S. standards.  That is, Statements (1), (2), and (3) do not differ in substance from Statement (4).  All the Statements have the same substance.  Therefore the PPE independently bars coverage for Statement (4), and Allianz has no duty to indemnify for that alleged Statement.[8]

### D. Alternatively, JMC cannot prove that the Allianz Policies cover two-thirds of JMC's settlement with TPS.

Alternatively, JMC cannot prove (again, trigger coverage) that the Allianz Policies cover the two-thirds portion of the Antitrust Judgment that resulted from the trebling of the jury verdict under 15 U.S.C. § 15.  Any duty that Allianz may have to indemnify JMC for JMC's settlement with TPS would be commensurately reduced by two-thirds.

Under the Allianz Policies, there is no coverage for defined "punitive damages" if the insured files a declaration-of-coverage suit against Allianz in a State that does not permit coverage for punitive damages.  ECF 63-1, p. 973 ¶ 2.a. (Allianz_001590).  That is the situation here: (1) JMC has sued Allianz in Colorado for a declaration of coverage,

---

[8] With no duty to indemnify for <u>any</u> Statement, Allianz cannot have acted in bad faith by not indemnifying.  *See MarkWest Hydrocarbon, Inc. v. Liberty Mut. Ins. Co.*, 558 F.3d 1184, 1192-93 (10th Cir. 2009) (a Colorado "bad faith claim must fail if … coverage was properly denied and the plaintiff's only claimed damages flow from the denial of coverage").  Thus summary judgment also should include Plaintiffs' bad faith claims as based on duty to indemnify.

*see* Instant Complaint, ¶¶ 125-130; and (2) Colorado bars coverage for punitive

damages, *see Lira v. Shelter Ins. Co.*, 913 P.2d 514, 517 (Colo. 1996).

The next and last question for this subheading is whether any portion of the

Antitrust Judgment meets the Policy definition for "punitive damages."  As pertinent

here, the Allianz Policies define "punitive damages" as follows:

> "Punitive damages" … means damages awarded by a court above
> and beyond the requirements for compensating a plaintiff for …
> "personal injury" … and intended to reform or deter the defendant
> and similar persons from pursuing a course of action such as that
> which damaged the plaintiff.

> ECF 63-1, p. 974 (Allianz_001591).

This definition contains just two elements.  Both are met here.

First, the Antitrust Judgment awarded damages "above and beyond" the

compensation that the Trial jury affixed for TPS.  The jury's verdict determined that

TPS's actual loss was $6,149,090 (as remitted by Judge Hegarty).  The amount added

to that number when that number is trebled—$12,298,180—is hugely "above and

beyond" the level of compensation that the verdict required.

Second, deterrence is an important purpose (one of three purposes) for trebling

antitrust verdicts under 15 U.S.C. § 15.  Although trebling under that statute was

"designed in part to punish past violations of the antitrust laws," it was "also designed to

deter future antitrust violations" and compensate antitrust victims.  *Am. Society Mech.*

*Engrs. v. Hydrolevel Corp.*, 456 U.S. 556, 575-76 (1982).  *Accord Texas Industries v.*

*Radcliff Materials*, 451 U.S. 630, 639 (1981) (stating, in a federal antitrust case, that

"[t]he very idea of treble damages reveals an intent to punish past, and to deter future,

19

unlawful conduct") (underlining added); *Pfizer, Inc. v. Govt. of India*, 434 U.S. 308, 314 (1978) (15 U.S.C. § 15 "has two purposes: <u>to deter</u> violators and deprive them of the fruits of their illegality, and to compensate victims of antitrust violations for their injuries") (cleaned up; underlining added). *And see In Re New Mexico Natural Gas Antitrust Litigation*, 607 F. Supp. 1491, 1506 (D. Colo. 1984) ("Treble damages under the antitrust laws are much like punitive damages in other civil litigation."). Because deterrence is an important reason for trebling antitrust verdicts, the second element of the Policies' definition of punitive damages is also satisfied here.

As the Policies do not provide coverage for "punitive damages" as defined, and the trebled portion of the Antitrust Judgment satisfies both elements of that definition, there is no coverage for the trebled portion of the Antitrust Judgment. That portion is two-thirds of that judgment. Accordingly there is no coverage for two-thirds of the confidential amount that JMC paid to TPS to settle the Antitrust Judgment.

## CONCLUSION

The Court should hold, on summary judgment, that Allianz has no duty to indemnify Plaintiffs at all. Alternatively, the Court should grant summary judgment against JMC on two-thirds of any indemnity obligation owed by Allianz.

Dated:  March 20, 2026

Respectfully submitted,

*s/ Dean Neuwirth*
Terence M. Ridley
Dean Neuwirth
Spencer Fane LLP
1700 Lincoln Street, Suite 2000

20

Denver, CO  80203
Telephone:  303.839.3800
Facsimile:  303.839.3838
Email:  tridley@spencerfane.com
          dneuwirth@spencerfane.com

Attorneys for Allianz Global Risks US
Insurance Company

## CERTIFICATE OF SERVICE (CM/ECF)

I certify that on March 20, 2026, I caused the foregoing motion (and referenced exhibits) to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following email addresses:

- **Terence M. Ridley**
  tridley@spencerfane.com, eseefried@spencerfane.com, lnorris@spencerfane.com

- **Dean Neuwirth**
  dneuwirth@spencerfane.com; tkane@spencerfane.com

- **Brian J. Spano**
  Brian.Spano@wbd-us.com

- **Holly C. White**
  Holly.White@wbd-us.com

- **Caitlin C. McHugh**
  Caitlin.McHugh@wbd-us.com

- **Christopher J. Shannon**
  cshannon@walkerwilcox.com

- **Jose A. Ramirez**
  JRamirez@hollandhart.com

- **Michael E. Harmond**
  MEHarmond@hollandhart.com

- **Katherine D. Varholak**
  KDVarholak@hollandhart.com

21

- **Shannon N. Calhoun**
  SNCalhoun@hollandhart.com

- **Erica Mecler Caron**
  ecaron@fbtgibbons.com

- **William M. Harter**
  wharter@fbtgibbons.com

*s/ Dean Neuwirth*